IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION


In re:                          )
                                )
GRACENOTE, INC.,                )
                                )
          Plaintiff,            )
                                )
v.                              )Case No. 2:16-CV-950CW
                                )
SORENSON MEDIA, INC.,           )
                                )
          Defendant.            )
_____


Transcript of Motion Hearing to


BEFORE THE HONORABLE CLARK WADDOUPS


May 11, 2017


Karen Murakami, CSR, RPR
8.430 U.S. Courthouse
351 South West Temple
Salt Lake City, Utah 84101
Telephone: 801-328-4800

APPEARANCES OF COUNSEL:

For the Plaintiff:    RAY QUINNEY & NEBEKER
                      By Samuel C. Straight
                         Attorney at Law
                      Suite 1400
                      36 South State Street
                      Salt Lake City, Utah 84145

                      KELLY DRYE & WARREN LLP
                      By Steven Yovits
                         Attorney at Law
                      26th Floor
                      333 West Wacker Drive
                      Chicago, Illinois 60606


For the Defendant:    WORKMAN NYDEGGER
                      By Brent P. Lorimer
                         Attorney at Law
                      Suite 1000
                      60 East South Temple
                      Salt Lake City, Utah 84111

                      HONIGMAN MILLER SCHWARTZ AND
                      COHN LLP
                      By J. Michael Huget
                         Attorney at Law
                      Suite 100
                      315 East Eisenhower Parkway
                      Ann Arbor, Michigan 48108

1          **Salt Lake City, Utah, Thursday, May 11, 2017**

2                              *   *   *

3          THE COURT:  We are here in the matter of

4    Gracenote v. Sorenson Media, case 2:16-cv-950.  Will

5    counsel please state their appearance.

6          MR. STRAIGHT:  Your Honor, good afternoon,

7    Sam Straight and Steven Yovits.  Steven's from Kelly

8    Drye, and he'll make the argument today on behalf of the

9    plaintiff Gracenote.

10         THE COURT:  Thank you.

11         MR. LORIMER:  Brent Lorimer of Workman

12   Nydegger, and my colleague Michal Huget of Honigman,

13   Miller, Schwartz and Cohn on behalf of Sorenson.

14         THE COURT:  Thank you.  Just an explanation,

15   I've not joined a new gang, but I had some minor surgery

16   that requires me to wear a bandage.  Hopefully the

17   damage is only skin deep so I'll be able to understand

18   your arguments.

19             Let's begin with the defendant's argument.

20   I've read the pleadings, I've read the patent, and I

21   have read most of principal cases.

22         MR. HUGET:  Thank you, Your Honor.  I

23   appreciate the opportunity to be here today, and I will

24   be brief.  I know the court's aware of this matter

25   generally and I appreciate Your Honor's work on this

 1    matter.

 2              We're here, Your Honor, because Sorenson is

 3    seeking dismissal of the plaintiff's complaint because

 4    it does not -- it lacks the factual content to put

 5    Sorenson on fair notice of the nature of plaintiff's

 6    infringement claims.

 7              More particularly, Your Honor, the

 8    fundamental problem we have with this complaint is this:

 9    It lacks the sufficient detail for us to understand

10    which claims are being asserted against which products.

11    While there are some patent claims that are identified,

12    they are not tied to a particular Sorenson product.

13    There is simply no definition in this complaint of what

14    the infringing product is.  Presently it's ambiguous and

15    it potentially implicates numerous products and

16    platforms that we do not believe should be an issue in

17    this case.  When we look at the complaint it appears

18    like it may be narrower.  There are parts of this

19    complaint, for example, in paragraph 19 has a summary of

20    what it seems they are alleging.  And they say, and I'll

21    quote briefly, Upon information and belief, the

22    infringing product is capable of performing a variety of

23    functions, including content fingerprinting, to analyze

24    and take action, such as enabling targeted

25    advertisements, based on the content displayed to a

1    viewer.

2              So just a real world example, you're sitting

3    at your smart TV, you're sitting there watching a

4    football game or a basketball game, and they know --

5    there's enough information about you demographically,

6    that sort of thing, so that you're getting ads

7    appropriately targeted to you and not children's toy ads

8    or something like that, unless, of course, you're a

9    parent and it's around Christmastime or some other sort

10   of holiday.  That's one product that Sorenson offers.

11   It's an ad content replacement type product.

12             The problem is we have a number of other

13   products.  It's very clear from the information that

14   even the plaintiff has cited and tried to conflate a lot

15   of these products.  We have, for example, an Analytic

16   Suite product.  What is that?  You run a TV station and

17   you have -- you use the Analytic Suite product.  This

18   has fingerprinting, content fingerprinting to some

19   extent, as called for in the paragraph 19 in some of

20   these claims, but it doesn't do anything that targets

21   advertising to you, direct to you.  So it appears to

22   fall outside of what they're claiming, but I don't know

23   with particularity because they haven't tied any of

24   these claims to any particular products, and that's the

25   fundamental problem that we have here.  And it's a real

1    practical problem, given that we talked -- we had that

2    conversation in the hearing with you on the motion to

3    stay back, I believe, in November and we talked about

4    this a little bit.

5          But the real world problem we have with this

6    is what's the burden that we face as the defendant in

7    gathering the information we need to produce -- do I

8    have to produce Analytic Suite type information, that

9    platform, those type of documents and the other products

10    that I may -- that may be implicated and may not be.

11    That's why it's important for us to get a little more

12    particularity, it's important for the plaintiff to have

13    to tie the factual allegations of the accused products

14    to these claims with more particularity than has been

15    done now.

16          We cited a number of cases.  I won't go

17    through the cases, Your Honor, I know you've read them,

18    but the cases -- one in particular I thought was

19    appropriate was the *Apollo* case that we cite in our

20    reply brief, and I think it takes head-on this argument

21    that they say that they don't really have to identify

22    the infringing product.  The court there dismissed a

23    complaint because it said, a complaint that simply

24    identifies the allegedly infringing product, products,

25    excuse me, and parrots the language of a directed patent

 1    infringement claim by alleging that the defendant

 2    produces, uses, sells, and offers for sale the

 3    identified product without explaining how, if at all,

 4    defendant may be infringing without factual support

 5    cannot survive.  That is precisely what we have here.

 6    We just simply have allegations, we have on information

 7    and belief that they may infringe, and that's it, that's

 8    as far as it goes.  So we really need more information.

 9              And I want to address briefly, my last point

10    is because they made a -- I think they rely extensively

11    on this claim chart that they've attached to their

12    response.  It's not a claim chart.  A claim chart will

13    point with particularity to the accused product or

14    device or method.  What they did here is just simply cut

15    and paste the patent claims and compared them to what's

16    in the complaint.  That doesn't do anything for us.

17    That is simply -- it makes no effort because the

18    complaint makes no effort to relate any factual

19    assertions regarding the functioning of this product to

20    claims.  So the claim chart really is not a claim chart,

21    Your Honor.

22              So for those reasons and the reasons we've

23    put in our brief, unless the court has any questions,

24    those are the points that I wanted to stress today.  I'm

25    happy to respond briefly, if appropriate, after

1    plaintiff's argument.

2            THE COURT:  I may have some questions, but

3    let's hear from the plaintiff's counsel.

4            MR. HUGET:  Thank you.

5            MR. YOVITS:  Good afternoon Your Honor.  Let

6    me just plug in my cable here.

7            Your Honor, I have some slides and I'll go

8    over them on the computer, but I also have hard copies.

9    May I approach.  I have two, if you would like.

10           THE COURT:  Yes, please.  Give one to my

11   clerk as well.

12           MR. YOVITS:  Your Honor, here's a quick

13   summary of what I would like to go over.  It looks like

14   an awful lot, but it goes very quickly.  I think it will

15   give the background that we need to understand

16   Gracenote's complaint.  I would like to take a quick

17   look at Form 18.  I know we all agree it doesn't apply,

18   but I think for context, spending 20 seconds on it might

19   be useful.  Then also a very quick look at what the

20   requirements are for a complaint.  I know that the court

21   is well aware of the standards, and I don't intend to

22   spend much time on it.  But then I would like to give a

23   little explanation of what Gracenote's patents cover,

24   the accused SPARK product, and then tie it together by

25   showing how Gracenote's complaint reads the patents on

1    the product.  Again, it looks like a lot, but it will go

2    very, very quickly.

3            Form 18, as I said, everybody agrees that

4    this does not apply, but it's worth seeing that Form 18

5    really required almost nothing, a statement of

6    jurisdiction, a statement of patent ownership, a

7    statement that their patents are infringed by making,

8    using, or selling a device, and a statement that the

9    notice requirement has been met.  I don't think there's

10   any dispute in this case that Gracenote's complaint

11   contains much more than this.  In particular, there's an

12   element-by-element analysis and some explanation as to

13   how the claim elements are met.

14           So without Form 18 the question becomes

15   what's required.  And I think the answer is that there

16   are no hard and fast requirements.  That's -- it's up to

17   the court's discretion.  It's going to be case specific.

18   *Iqbal* tells us determining whether a complaint states a

19   plausible claim for relief will be a context-specific

20   task that requires the court to draw on its judicial

21   experience and common sense.

22           I think the one underlying function of a

23   complaint that all the cases seem to agree on is the

24   notice function.  The primary function of the complaint

25   is to put defendants on notice as to what they must

1    defend.  I've taken this quote from a Delaware case, but

2    we can find it in Federal Circuit cases, as well as

3    *Iqbal* and *Twombly*.  As I said, there are no hard -- seem

4    to be no hard and fast rules.  Some courts have dealt

5    with what might be required in a patent case, some are

6    more stringent than others.  This *Niazi* case that's very

7    recent from Wisconsin talks about in patent cases just

8    identifying the claims asserted and the devices accused

9    will be enough to do the job.

10              Let's take a quick look at Gracenote's

11   patents.  Gracenote's patents cover the insertion of

12   advertising and content into a video stream

13   automatically.  And it does that with these two

14   concepts, the main data stream and the reference data

15   stream.  The main data stream is what a broadcaster

16   sends out over the air, over the cable.  It's what you

17   would expect, it's what's intended for the viewer, the

18   commercials and the programming.  Whereas, the reference

19   data stream is less than that.  It's just the

20   programming.  And what you can do with the reference

21   stream is locate a particular point in the main data

22   stream where you want to insert content, and that will

23   be clear in a second.  I just note again, before leaving

24   this slide, that the reference data stream contains less

25   information.  It's only the programming and that enables

1    it to be transmitted at a slower data rate.

2              So what happens in Gracenote's patents is

3    that the data streams are fingerprinted.  And what that

4    means is little snapshots are taken of each video scene.

5    What that does is it allows for comparison between the

6    reference stream and the main data stream and allows

7    automatic content recognition.  In other words, it

8    automatically locates a place in the main data stream

9    where you want to insert some content.

10             So, for example, this is the movie *North by*

11   *Northwest,* you might recognize.  There are fingerprints

12   here of each -- a picture of each of these scenes, and

13   if you've decided that you would like to insert maybe an

14   advertisement after the point where Cary Grant falls to

15   the ground, you would take that fingerprint in your

16   reference stream and begin to compare it to the

17   fingerprints of the main content stream, and when you

18   find a match then you automatically locate it where you

19   want to insert your content.

20             Now, let me briefly talk about the accused

21   SPARK product.  And what we've named -- excuse me, what

22   we've named in the complaint is the SPARK product, and

23   Mr. Huget has argued that that's not really a product,

24   or that it's an overall brand name.  But what we can see

25   from the Sorenson Website, here's the home page, that

1    the company really has these two products, SPARK and

2    SQUEEZE.  Those are highlighted in yellow.

3           This boxed portion is also from the Sorenson

4    Website, and this portion talks about the overall SPARK

5    product.  And sometimes the Website variously refers to

6    it as either SPARK or SPARK Solutions.  Those seem to be

7    the same thing.  We've called it SPARK in the complaint.

8    On the right side here of this part of the Web page it's

9    called SPARK, on the left SPARK Solutions.  And in each

10   case they talk about how the various technologies, the

11   various suites that are the components of SPARK work

12   together to form this product.  And we find it several

13   times over and over again on the Sorenson Website.

14   There's the SPARK product here surrounded by its

15   component parts, the Analytics, Content, Ad and Video

16   Suites.  And again and again here we see a statement

17   that SPARK Solutions combine multiple elements of the

18   SPARK Analytics, Content, Ad and Video Suites to create

19   the end-user experience.

20          Now, the advertising and content placement

21   functionality of SPARK that Gracenote accuses is part of

22   the overall SPARK product.  It doesn't simply fit neatly

23   into one of the suites that Sorenson wants us to choose.

24   And the problem is if we have to choose one of the

25   suites, we're going to be denied the discovery that we

1    need to prove our case.  For example, we may want to --

2    we may have to choose the Ad Suite.  And then if we need

3    to get discovery on fingerprinting or how you match up

4    the scenes and the reference to the main data stream,

5    we'll be told, well, no, that's the Analytics Suite, you

6    can't have discovery on that because you named the Ad

7    Suite.

8              How do we know that the advertising content

9    placement is part of the overall SPARK product and not

10   part of one of the suites?  Well, we know it from the

11   Website, but we also know it from the presentation that

12   Sorenson came and gave to Tribune Media, which used to

13   be Gracenote's parent company.  This is some excerpts of

14   it.  Here's the cover page.  And this presentation

15   discusses each of the suites individually.  So here,

16   first, there's a title page for the Analytics Suite, and

17   it goes on to talk about what that is.  You can see

18   there's a diagram in here.  I don't want to read the

19   whole thing, but you can see on the left-hand side in

20   the dotted box it talks about fingerprinting and tagging

21   and harvesting that's done by the Analytics Suite.

22             The next section is the SPARK Content Suite.

23   Here's the title page for that.  There's a diagram that

24   shows the Content Suite is what pushes the content to

25   the user's television.  There's some more discussion.

1             Then finally there's a section on SPARK

2    Solutions, and here's the title page for that.  Again

3    there's a diagram.

4             And then there's this inserted page that

5    just says Adjustable Advertising Section.  There isn't

6    any more than that, just this, but this does show

7    clearly that Sorenson considers this to fall within the

8    overall SPARK product.

9             So with all that said now, finally coming to

10   Gracenote's complaint, the complaint doesn't contain

11   claim charts.  It does contain the information needed to

12   generate the claim charts, which is what's important to

13   serve the notice function.  There's no particular magic

14   to have it in claim chart form.

15            So I want to address here what Mr. Huget was

16   talking about, the claim chart that we put in the

17   briefs.  Again, this is not in the complaint.  I simply

18   put this together to show how easily it can be done from

19   the text in the complaint, and that all the information

20   that's needed to put the defendant on notice is there.

21   So on the left I've set forth the claim elements.  On

22   the right I've set forth the language from the

23   complaint.  And I've even color-coded a little bit, so

24   where you see on the left you see red, the right -- the

25   right side has red showing where the complaint makes an

1   explanation of how that element is infringed.

2          So very quickly I'll go through this.  This

3   is for Claim 1 of the '718 patent, an apparatus

4   comprising of processor configured by a comparator unit

5   to receive a main data stream and a reference data

6   stream.  Here's a point where the complaint -- I'm just

7   parroting the claim language because these things are

8   going to be explained later.  We just say SPARK operates

9   by receiving both the main data stream and a reference

10  data stream.  We're going to explain that immediately

11  below.

12          The next element is that the main data

13  stream includes main content elements intermixed with

14  inserted content elements.  And on the right side we

15  give the claim language, enough claim language to make

16  it evident which element to the claim is being referred

17  to, but also add enough to give some explanation.  So

18  here we say the main data stream includes a plurality of

19  main content elements, and that's the program content,

20  intermixed with inserted content elements, e.g.,

21  advertisements.  So here what we've done is we've

22  explained how the main content element appears in the

23  SPARK product, it's the program content.  How the

24  inserted content elements appear in the accused product,

25  it's the advertisements.

1              And we go on similarly, the reference data
2    stream having a different data rate than the main data
3    stream.  And we explain on the right that the reference
4    data stream has less data than the main data stream.
5    And that's the explanation for how it has a different
6    data rate.
7              The next element is including reference
8    fingerprints to the main content elements of the main
9    data stream, on the right the explanation.  The
10   reference data stream includes reference fingerprints
11   and time stamps, i.e., elements of markup information of
12   the main content elements of the main data stream,
13   thereby explaining that the reference data stream is the
14   main content element.
15             The next element, there's not much more to
16   explain.  These are terms that have already been dealt
17   with.  Compute means fingerprints from at least some of
18   the main content elements included in the main data
19   stream.  Our complaint simply has that language.
20             And then, finally, the last element, a
21   control unit configured to select the main content
22   elements from the main data stream based on a comparison
23   of the main fingerprints to the reference fingerprints.
24   On the right we explain that selection process.  SPARK
25   then identifies a main fingerprint that corresponds or

1    links with a reference fingerprint.  The infringing

2    product selects a displayed main content element based

3    on reference fingerprints.

4            What I would like to do now before leaving

5    this slide is to just point out on the right side we can

6    see the various suites that are implicated in this one

7    product or this one functionality.  That is, if we look

8    at the red, the program content, well that's the Content

9    Suite, and probably also the Video Suite.  We have the

10   advertisements, that's the Ad Suite.  We have, as you go

11   on, the fingerprinting, the comparing of the

12   fingerprints to do the automatic content recognition,

13   and that's the Analytics Suite.  We can't simply pick

14   one of the component technologies to accuse.

15           So, you know, the upshot of Sorenson's

16   argument is that they're unable to tell whether it's the

17   Analytics Suite or the Content Suite or the Ad Suite,

18   but as we've seen, the complaint clearly describes

19   television programs intermixed with advertisements,

20   taking fingerprints of the television programs, matching

21   up main and reference fingerprints to select the

22   particular points in the video.  So it's clear, what

23   we're accusing is our functionality of SPARK is named,

24   and what we're accusing is that functionality that

25   inserts these advertisements or special content.

1          Mr. Huget read already claim -- paragraph 19

2     of the complaint, which I think sets it up very nicely.

3     What the complaint does is as we are just beginning to

4     get into the allegations we say, Upon information and

5     belief, the infringing product is capable of performing

6     a variety of functions, including content

7     fingerprinting, to analyze and take action, such as

8     enabling targeted advertisements, based on the content

9     displayed to the viewer.  At the core of the infringing

10    product is an automatic content recognition platform.

11    So when Sorenson says in its briefs that they don't know

12    whether perhaps it's the Video on Demand or some other

13    product that's being accused, I think this paragraph

14    makes it quite clear.

15          And unless there are any questions, I'll

16    take my seat.

17          THE COURT:  No.  Thank you.

18          Mr. Huget?

19          MR. HUGET:  Yes, briefly, Your Honor.  Thank

20    you, Your Honor.

21          This shouldn't be that difficult, Your

22    Honor, I mean, for example, page 32 -- sorry, I don't

23    have a PowerPoint or anything -- but page 32, how SPARK

24    Analytics Suite works.  Take the patent, take the

25    claims, give me a complaint that says you now have all

1   this, tell me what elements of the patent claims read on
2   this.  It shouldn't be that difficult.  We don't have
3   that.
4            Counsel admitted that they picked and choose
5   from various of these different suites we have.  And to
6   say it's all one product, I think is sort of like
7   saying -- we put this in our brief, it's sort of like
8   saying you have Microsoft Office, that's one product.
9   It's not.  You have Word, you have Excel, you have
10  PowerPoint.  It's their -- do all of them accuse?  We're
11  not saying that they have to pick one.  We're just
12  saying for each one that you pick, tell us where it is,
13  tell us how it infringes.  You have the patent claims,
14  you have this information.
15           THE COURT:  What additional public
16  information would be available that would allow them to
17  plead with more detail?
18           MR. HUGET:  This is a fair amount of
19  information.  I don't know if there's much more than
20  this that's publicly available, but it seems to me, and
21  they've relied on it here, it seems to me that they've
22  got plenty of information here that they could go
23  through, and between this an other presentations they've
24  apparently gathered that we have -- and by the way, this
25  wasn't in front of the court before, this --

1          THE COURT:  How would the case be advanced

2    if they were to go back, which you've asked, and amend

3    their complaint to include what you already know?

4          MR. HUGET:  Because I don't know if this

5    suite is being accused of infringement.  Is it?  How is

6    it?  Then I know what I have to produce, then I know

7    what I have to focus on in discovery, then I know what

8    my initial disclosures, the scope of my initial

9    disclosures have to be.

10         THE COURT:  But under our patent rules you

11   will know that almost immediately.

12         MR. HUGET:  That is if they -- they have

13   already filed their accused instrumentalities pleading,

14   and it does nothing more than what their claim chart

15   does now, it doesn't give me that focus, it doesn't

16   identify infringing products.  I don't have much more

17   information because they went ahead and filed that.  As

18   the court will recall, we were in front of you by phone

19   last November, and we asked that they be stayed, and

20   this argument came up, and we -- the point we had was

21   they've filed the accused instrumentalities, but it

22   doesn't tell us anything more than this claim chart.

23         THE COURT:  Isn't your proper relief to tell

24   them that they need to amend and provide more detail in

25   their chart, in their accused infringement chart?

 1          MR. HUGET:  We would be satisfied with that

 2   result, Your Honor.  Most of the cases we have cited to

 3   you, at least the cases that are in the first go-round,

 4   are cases in which the court has granted leave.

 5          THE COURT:  Let me ask Mr. Yovits, is there

 6   a reason why you failed to provide more information in

 7   your -- when you provided the initial disclosure that

 8   sets forth what your infringement claims were beyond

 9   what's in the complaint?

10          MR. YOVITS:  No, Your Honor.  We simply felt

11   that the complaint set forth very clearly what we were

12   accusing and how the SPARK product was accused and we

13   simply renamed the SPARK product.  We are certainly

14   happy to include much more information in the accused

15   instrumentalities disclosure if that solves the problem.

16          THE COURT:  Does that solve the problem?

17          MR. HUGET:  Well, if they can do it in the

18   accused instrumentalities, they can do it in the

19   complaint.

20          THE COURT:  Why go through that step?

21          MR. HUGET:  Well, because I don't know

22   how -- because at least if there's -- am I going to

23   fight over the amended complaint if it's not sufficient

24   or the accused instrumentalities?  I guess that's why we

25   have the problem is the clock starts ticking on what I

1    have to do, unless I come to you and say, wait, I can't

2    produce this, but the clock's ticking, can you hear me

3    in time before I have to produce this?  If I have a

4    complaint, the starting point of it is a sufficiently

5    detailed complaint, then we don't have those issues, we

6    don't have scrambling in discovery, because now I have

7    to produce additional disclosures and I have a ticking

8    clock.  And I appreciate the court heard us quickly last

9    time, but you may be in trial or something may happen

10   and you may not want to hear us.  But if we have a

11   robust complaint, then they can just cut and paste from

12   their complaint into their accused instrumentalities and

13   we're off and running.

14           THE COURT:  How do you respond to that,

15   Mr. Yovits?

16           MR. YOVITS:  Your Honor, I agree with you.

17   I don't think -- if indeed I'm agreeing with you, I'm

18   not sure, I don't think there is any point in delaying

19   and belaboring the process any further.  If we can

20   provide this level of detail in our initial disclosures,

21   in our accused instrumentality disclosures, that seems

22   to be the way to get this case on track.

23           THE COURT:  I'm still -- your initial

24   argument was you didn't know which of the four products

25   were accused.

1          MR. HUGET:  I still don't.

2          THE COURT:  Well, now you understand, and I

3    think it's set forth in the complaint, that they're

4    accusing aspects of every one of the four -- one of

5    their products, suites that are set forth in the SPARK

6    products, you now know that.

7          MR. HUGET:  But what it doesn't do for me is

8    tell me with this product where is the proof -- what

9    claims of the -- they cited read on the SPARK Analytics

10   Suite works, for example, why can't they give me a claim

11   chart that says -- that points that out.  That's their

12   burden.

13         THE COURT:  That's what the initial

14   disclosure that they're required to do.  If that initial

15   disclosure is not adequate, it seems to me the way to

16   advance this case is to require that they modify it and

17   amend their initial disclosure.  When you get it and you

18   believe it doesn't give you adequate notice, you can

19   always come back to the court.  If they've provided you

20   everything that is publically available at that point,

21   then I think discovery has to pursue in terms of your

22   responding to their -- to the next step that's required

23   for Sorenson.  As a practical matter, what's wrong with

24   that approach?

25         MR. HUGET:  The practical matter is that

1    it's a defective complaint.  It's still -- they're

2    picking and choosing out of four different suites and

3    saying it's all in there, trust us, the claims read on

4    this, that and that.  I don't have that level -- there's

5    nothing that ties the product to the product -- to the

6    claims.

7              THE COURT:  Let me ask Mr. Yovits, in your

8    initial disclosure will that information be included?

9              MR. YOVITS:  We certainly are happy to

10   include that information, Your Honor, to advance the

11   ball.

12             MR. HUGET:  They haven't done it so far, and

13   that's the problem.  I believe, and the case law

14   supports it, that that should be in the complaint.

15             THE COURT:  Well, in terms of reading the

16   case law, I'm not satisfied that you're correct about

17   that because we're still at this, I suspect, exploratory

18   stage as to what *Iqbal* and *Twombly* are going to require

19   in a patent case once we got rid of the notion that you

20   could plead Form 18.  And I've read a number of cases,

21   and a number of them say it's adequate if you plead what

22   the patent is, you plead the claims that you believe are

23   infringed, and you plead the product and identify how

24   you believe the product infringes those claims.  I think

25   that's all pled here.

1           MR. HUGET:  Well, I think the cases go

2   slightly a step farther, and they say you have to relate

3   the factual assertions to the asserted claims.  And I

4   think that's what we're lacking here.  These factual

5   assertions, when I looked at this chart they put up,

6   there's no attempt to relate that to the asserted

7   claims, none.  That's our problem.  If they could do

8   that and put that in a complaint in 2 weeks, 21 days, I

9   don't intend to come back here on a -- again, if they do

10   that, believe me, we'll be off and running then.  We'll

11   file an answer and we'll be off and running.  At least

12   I'll know what's in the complaint.

13           THE COURT:  Mr. Yovits, do you want to

14   respond to that?

15           MR. YOVITS:  Yes, Your Honor.  The complaint

16   is not defective.  What we've done is we've identified

17   the various aspects of the suites that go into the

18   product that's infringing, we've identified the way in

19   which -- or the functionality of the product that we are

20   accusing.  There just doesn't seem to be a reason.  And

21   because I am certainly willing and committing at this

22   time to provide an extra detailed initial disclosure, I

23   think there doesn't seem to be any reason not to pursue

24   it that way.

25           THE COURT:  How soon could you do that?

1          MR. YOVITS:  14 days.

2          THE COURT:  Anything further, Mr. Huget?

3          MR. HUGET:  No, Your Honor.  Well, I guess

4   my question is where do we go from there, the

5   scheduling, I mean how would the court like to proceed?

6   If we don't think that's sufficient, what would the

7   court prefer we do?  If we still have the same problems

8   with that document that we have today, is there a

9   preferred -- I don't want to guess as to what the court

10  would like us to do, but I would like to proceed in a

11  manner that's consistent with the court's preferences.

12         THE COURT:  Well, I guess it depends on what

13  your objections are.

14         MR. YOVITS:  Your Honor, if I may, I think

15  the proper procedure would be if they're not satisfied

16  with this to let us know, and I commit to working in

17  good faith to get them whatever information they believe

18  they need.  And I think it's very unlikely that we would

19  have to come back to the court.

20         THE COURT:  I'm not going to rule from the

21  bench.  I will issue a written ruling and it will come

22  out soon, and I will address the issues that you've

23  raised.  I think that it's appropriate for our district

24  and our circuit to have an answer to the questions that

25  you've appropriately raised, and so I'm going to issue a

1    written ruling on this.  But I'm inclined to believe

2    under our fast track discovery program that we follow in

3    this district you can get a remedy very quickly.

4              MR. HUGET:  I appreciate that.  I trust the

5    court on that point.  My concern is -- I'm thinking

6    ahead to the disclosures and having to produce

7    different -- these programs are for different sets of

8    code, the Analytics Suite, Video Content, Video on

9    Demand, they're different sets of code, they're in

10   different stages of development because they're

11   constantly developing things.  Do they connect together?

12   But they're different buckets.  Do I have to produce all

13   four buckets?  Do I produce one bucket?  That's my

14   concern because that's going to be the burden.  Do I

15   have to start producing source code and things like

16   that?  I would really like to know because when my

17   client says, why do we have to produce Video on Demand,

18   where does it say that code?  Where is there anything in

19   the complaint that accuses our Video on Demand product?

20   That's in here.  That's the challenge I'm trying to

21   address, Your Honor.

22             MR. YOVITS:  Your Honor, we're not accusing

23   Video on Demand.  We won't ask for discovery on it.  And

24   I would suggest that if there are any other areas that

25   are unclear like that, we'll just talk, we'll make it

1    clear, and then if it's still not satisfactory, maybe

2    then we come back to the court.  But I do not believe --

3              THE COURT:  I think that's what the rules

4    contemplate.  When you get their additional disclosure,

5    if you've got questions about which parts of your suite

6    are under challenge, write a letter, make a record of

7    it.  If they're not responsive, I'll help you.

8              MR. HUGET:  I appreciate that.  That's the

9    first we've heard that in this case while this motion

10   has been pending, they've never said that before today.

11   They've said, well, it's all under the number of

12   SPARK --

13             THE COURT:  I suspect if they amended their

14   complaint there would still be questions.

15             MR. HUGET:  If the court gave them some

16   guidance, they've had to do more, and if they're willing

17   to do a revised accused instrumentalities, then I think

18   that there is -- some of that could be in the complaint.

19             THE COURT:  You should anticipate and start

20   working on your revised accused instrumentalities

21   because you're going to have to provide that.  It's

22   going to be like 14 days, so don't delay.  And if when

23   you get it it's not adequate, raise it, and we'll deal

24   with it immediately, but I think we need to move forward

25   with this case.

```
 1              MR. HUGET:  Thank you.
 2              THE COURT:  And I'll explain this more fully
 3  in my written opinion, but I believe that the complaint
 4  in this case gives adequate notice to satisfy the rules
 5  under Iqbal and Twombly.  Obviously, there's going to be
 6  more discovery, there's going to be more detail that
 7  will be produced in this case.  But delaying another
 8  period of time to amend the complaint and then dealing
 9  with the challenge at that time I think is just delaying
10  the resolution of this issue.  So we'll move forward in
11  that fashion.
12              Anything further before we recess?
13              MR. HUGET:  No, Your Honor.  Thank you.
14              MR. YOVITS:  No.  Thank you.
15              THE COURT:  Thank you.
16              (Whereupon, the matter was concluded.)
17                        *   *   *
18
19
20
21
22
23
24
25
```

1                     C E R T I F I C A T E

2

3    State of Utah

4    County of Salt Lake

5

6         I, Karen Murakami, a Certified Shorthand Reporter

7    for the State of Utah, do hereby certify that the

8    foregoing transcript of proceedings was taken before me

9    at the time and place set forth herein and was taken

10   down by me in shorthand and thereafter transcribed into

11   typewriting under my direction and supervision;

12        That the foregoing pages contain a true and

13   correct transcription of my said shorthand notes so

14   taken.

15        IN WITNESS WHEREOF, I have hereunto set my hand

16   this  1st  day of June, 2017.

17

18

19                              _____

20                              Karen Murakami, CSR, RPR

21

22

23

24

25